UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **DONNIE LYNN HUGHES**, | } |
| Plaintiff, | } |
| v. | } Case No.: 2:16-CV-208-MHH |
| **NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,** | } |
| Defendant. | } |

## MEMORANDUM OPINION

Pro se plaintiff Donnie Lynn Hughes brings this action pursuant to Title II of Section § 205(g) of the Social Security Act. Mr. Hughes seeks review of a decision by the Commissioner of the Social Security Administration denying his claims for a period of disability and disability insurance benefits. *See* 42 U.S.C. § 405(g). After careful review, the Court remands this action to the Commissioner.[1]

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. (*See* https://www.ssa.gov/agency/commissioner.html). Therefore, the Court asks the Clerk to please substitute Ms. Berryhill for Carolyn W. Colvin as the defendant in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later opinions should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r of Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in

the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## PROCEDURAL AND FACTUAL BACKGROUND

On December 28, 2012, Mr. Hughes filed a Title II application for a period of disability and disability insurance benefits. (Doc. 7-6, p. 2). Mr. Hughes alleges that he became disabled on March 25, 2011. (Doc. 7-6, p. 2). The Social Security Administration denied Mr. Hughes's claim on February 20, 2013. (Doc. 7-5, p. 4). Consequently, Mr. Hughes filed a written request for a hearing. (Doc. 7-5, p. 16).

The Social Security Administration granted Mr. Hughes's request, and on April 28, 2014, Mr. Hughes appeared and testified at a video hearing before an administrative law judge. (*See* Doc. 7-3, pp. 78–115). Julia Russell, a vocational expert, and Joel S. Roger, an attorney who represented Mr. Hughes, also appeared at the hearing. (*See* Doc. 7-3, p. 79).[2] At the time of his hearing, Mr. Hughes was 43 years old. (Doc. 7-3, p. 83).

---

[2] Although Mr. Hughes was represented by counsel at the hearing, he submitted his appeal *pro se*. Consistent with the pleading standards that apply to *pro se* litigants, the Court has construed Mr. Hughes's arguments liberally. *See Gluchowski v. Comm'r of Soc. Sec.*, 2014 WL 2916750, at *5 n.4 (M.D. Fla. June 26, 2014) ("[A]lthough Plaintiff was represented by counsel at the hearing, Plaintiff is proceeding *pro se.* The Court must construe *pro se* pleadings liberally.") (internal citation omitted); *see generally Tannenbaum v. United States*, 148 F.3d 1262, 1263

Mr. Hughes testified that he attended school through the seventh grade and left during his eighth grade year at the age of sixteen. (Doc. 7-3, p. 90). Mr. Hughes stated that after he failed the first grade his school wanted to place him in special education, but his mother refused. (Doc. 7-3, p. 90). Mr. Hughes tried to get his GED, but he did not pass the test. (Doc. 7-3, p. 91). Mr. Hughes testified that he reads on a third-grade level, he cannot spell, and he struggles with writing. (Doc. 7-3, pp. 90–91, 107). Mr. Hughes has work experience as a maintenance worker, water meter reader, and maintenance mechanic. (Doc. 7-3, p. 108). Mr. Hughes indicated that as a water meter reader, he dug with a shovel; he had no other tasks. (Doc. 7-3, pp. 107–08).

On May 27, 2014, the ALJ denied Mr. Hughes's request for disability benefits. The ALJ found that Mr. Hughes did not have an impairment or a combination of impairments that meets or medically equals the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Doc. 7-3, pp. 59, 65). The ALJ applied the Social Security Administration's "five-step sequential evaluation process for determining if an individual is disabled," noting that the evaluation would not proceed to the next step "[i]f it is determined that the claimant is or is not disabled at a step of the evaluation process[.]" (Doc. 7-3, p. 63).

---

(11th Cir. 1998) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed.").

The ALJ found that Mr. Hughes had not "engaged in substantial gainful activity since March 25, 2011, the alleged onset date[.]" (Doc. 7-3, p. 64). The ALJ also found that Mr. Hughes has the following severe impairments: "degenerative disc disease of the cervical and lumbar spine; depression; [and] anxiety." (Doc. 7-3, p. 64). The ALJ determined that "the[se] impairments are 'severe' within the meaning of the Regulations because they more than minimally limit the claimant's ability to perform basic work activities." (Doc. 7-3, p. 64). Additionally, the ALJ observed that Mr. Hughes has non-severe impairments including: snoring; sleep apnea; waking up jerking and jumping; dyspnea (defined as difficult or labored breathing), hypersomnia, unspecified; periodic limb movement disorder; and chronic obstructive bronchitis without exacerbation. (Doc. 7-3, p. 65). With respect to these conditions, the ALJ stated:

> [On] March 2011, the claimant complained of snoring, nocturnal apnea, waking up jerking and jumping and dyspnea. A pulmonary function test indicated mild obstructive and restrictive lung deficits and mildly reduced diffusing capacity. A chest x-ray was normal. The claimant's physician diagnosed rule out [sic] obstructive sleep apnea, hypersomnia, unspecified; snoring; periodic limb movement disorder; chronic obstructive bronchitis without exacerbation. [Mr. Hughes] was prescribed symbicort inhalations.
>
> The claimant followed up for his respiratory complaints in January 2012. He noted no acute pulmonary complaints. He was still smoking. A physical examination revealed normal breathing. The claimant had diminished breath sounds but no rales, no rhonchi, no wheezing and no edema. The claimant's most recent chest x-ray revealed hyperinflation, increased interstitial marking and multiple

> head granulomas. The claimant was diagnosed with chronic obstructive bronchitis without exacerbation and tobacco abuse.
>
> There is no further evidence of any pulmonary issues or complaints after January 2012. The claimant mentioned no complaints at the hearing. He admitted, however, that he continues to smoke against the recommendations of his physicians (Hearing Testimomy).
>
> Accordingly, as there is no evidence in the record that indicates that these impairments would cause the claimant any more than minimal functional limitations, the undersigned finds them to be nonsevere.

(Doc. 7-3, p. 65).

The ALJ next determined that Mr. Hughes's impairments do not meet or medically equal the severity of an impairment listed in the regulations. (Doc. 7-3, p. 65). With respect to Mr. Hughes's physical impairments, the ALJ found that the criteria under listings 1.04A, 1.04B, and 1.04C were not satisfied based on the medical evidence. (Doc. 7-3, p. 65). With respect to Mr. Hughes's mental impairments, the ALJ found that the severity of these impairments do not meet or medically equal the criteria of listing 12.04B or 12.04C. (Doc. 7-3, p. 65). Listing 12.04B requires evidence that the mental impairment "result[s] in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation. (*See* Doc. 7-3, p. 65-66) (referencing listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1). The ALJ noted that "[a] marked limitation means more than moderate but less than extreme." (Doc. 7-3, p. 66).

The ALJ concluded that Mr. Hughes's mental impairments were moderate but not marked. (Doc. 7-3, p. 66).

Based on the above factual findings, the ALJ concluded that Mr. Hughes had the "residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b) with some exceptions. (Doc. 7-3, p. 67). The ALJ opined:

> [Mr. Hughes] is able to occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs but never ladders, ropes or scaffolds; must avoid all exposure to hazardous machinery and unprotected heights; must avoid concentrated exposure to extreme cold, extreme heat, fumes, dusts, gases and poor ventilation; must work in an environment where tasks are learned through demonstration as opposed to reading; . . . the claimant may have casual contact with coworkers, supervisors and the public; the claimant must work in an environment where changes are infrequent but when necessary are introduced gradually; must be permitted to alternate between sitting and standing every 30 minutes to an hour while remaining on task; is able to perform goal-oriented work rather than work that requires stringent production or fast pace; the claimant will be off task 10% of the day.

(Doc. 7-3, p. 67).

Based on this residual functional capacity assessment, the ALJ determined that Mr. Hughes is not capable of performing his past relevant work, but there are jobs that exist in significant numbers in the national economy that Mr. Hughes can perform. (Doc. 7-3, p. 72). The ALJ relied on the hearing testimony of Ms. Russell, a vocational expert, who stated that Mr. Hughes could perform the requirements of occupations such as machine tender, bakery worker, and sorter.

(Doc. 7-3, p. 73). The ALJ concluded that Mr. Hughes is not disabled within the meaning of the Act, and the ALJ denied Mr. Hughes's application for benefits.

In concluding that Mr. Hughes is not disabled, the ALJ gave great weight to the opinions from state agency medical consultants Dr. Robert Heilpern, M.D. and Dr. Robert Estock, M.D. Neither Dr. Heilpern nor Dr. Estock examined Mr. Hughes. The ALJ did not state what, if any, weight he afforded to the findings of Mr. Hughes's treating physicians.

The ALJ determined that Mr. Hughes's testimony concerning his limitations was only partially credible. The ALJ found that although Mr. Hughes had a severe back injury in March 2011, "by February 2012, the claimant was noted to be at maximum medical improvement and able to return to work." (Doc. 7-3, p. 68). Mr. Hughes testified that the doctor who released him to return to work had previously scheduled him for back surgery. (Doc. 7-3, pp. 101-102). Mr. Hughes testified that the doctor—a workmen's compensation physician and not Mr. Hughes's treating physician—released him to return to work only because he (Mr. Hughes) declined the doctor's recommendation for back surgery. (Doc. 7-3, p. 102). Mr. Hughes testified: "I was up for major back surgery. And six days later I was back at work[.]" (Doc. 7-3, p. 101).

On June 26, 2013, Mr. Hughes sought review by the Appeals Council of the ALJ's decision. (Doc. 7-3, p. 57). As part of his appeal, Mr. Hughes presented

8

medical records from Southside Pain Management, dated September 16, 2014 through December 8, 2015 that were not before the ALJ. (Doc. 7-3, pp, 10-56). Those records reflect ongoing complaints of back pain, MRI imaging showing disc protrusions at L4-5 and L5-S1, and degenerative changes of the lumbar spine; multiple lumbar steroid injections; continued discussion of the potential for surgical intervention; continued complaints of coughing, wheezing, and shortness of breath (though the provider noted no dyspnea and normal air movement); and anxiety and depression. (*See* Doc. 7-3, pp. 8-34).

In a ruling dated December 8, 2015, the Appeals Council affirmed the ALJ's decision, finding that the new medical records did not provide a basis for altering the ALJ's opinion. Mr. Hughes then appealed to this Court and supplemented the medical evidence in support of his claim for disability benefits. Mr. Hughes filed the following new medical evidence in this Court:

•Request for Medical Information, dated July 20, 2015, completed by Dr. Ronald Moon, Jr., D.O., indicating that Mr. Hughes is not physically or mentally able to work due to chronic, recurrent neck and low back pain. (*See* Doc. 9, p. 3).

•Treatment notes dated February 24, 2012 from Valley Center for Nerve Studies and Rehabilitation, (treating physician not clear from records), indicating neck pain, radiation of pain in the arms and numbness in the right leg. (*See* Doc. 9, p. 7).

•Treatment notes dated February 29, 2012, by Dr. Michael S. Kendrick, M.D., with diagnoses of "degeneration of thoracic or lumbar intervertebral disc"; "lumbar or lumbosacral intervertebral disc"; "thoracic or lumbosacral neuritis or radiculitis, unspecified"; "degeneration of cervical intervertebral disc"; and "brachial neuritis or radiculitis NOS[.]" Dr. Kendrick also noted symptoms of

9

restless legs (treated with Remeron and Klonopin); depression (dysthymic disorder) and anxiety (treated with Klonopin); and "positive straight-leg raising test (bilateral) and extension decreased." (*See* Doc. 9, pp. 9-10).

•Treatment records dated August 11, 2006 and August 12, 2006—treating physician unknown—notes are not legible due to poor print quality. (Doc. 9, p. 16).

•MRI report dated April 12, 2011, noting "[m]inimal discogenic degenerative change at L4-5, with mild central disc protrusion at L5-S1; creating no significant central canal stenosis or definite neural impingement." (Doc. 9, p. 20).

•Treatment notes from Shelby Center for Nerve Studies and Rehabilitation, completed by Dr. Eric Beck, M.D., dated February 24, 2012, noting limited range of motion in the head and neck and joint pain in the hands. (Doc. 9, p. 25).

•Treatment notes from Birmingham Neurosurgery & Spine Group, P.C., completed by Dr. E. Carter Morris, M.D., indicating an impairment rating of 10% and releasing Mr. Hughes to light duty with restrictions from the functional capacity exam. (Doc. 9, p. 29).

•Treatment notes from Birmingham Neurosurgery & Spine Group, P.C., completed by Dr. E. Carter Morris, M.D., dated March 12, 2012, noting Mr. Hughes's continued complaints of neck and back pain and Dr. Morris's assessment that Mr. Hughes "is not having a cervical disc problem" and "his lumbar degenerative disc problem is no worse than it was a year ago." (Doc. 9, p. 30).

•Incomplete treatment notes from Birmingham Neurosurgery & Spine Group., P.C., completed by Dr. E. Carter Morris, dated September 28, 2011 – only 1/3 pages submitted with no discernible information. (Doc. 9, p. 31).

Mr. Hughes also filed in this Court a number of medical records that already were part of the administrative record.[3]

---

[3] *Compare* Doc. 9, p. 4–5 *with* Doc. 7-9, pp. 15-16; Doc. 9, p. 6 *with* Doc. 7-10, p. 21; Doc. 9, p. 8 *with* Doc. 7-9, p. 34; Doc. 9, p. 13–14 *with* Doc. 7-13, pp. 7-8; Doc. 9, p. 15 *with* Doc. 7-13, p. 11; Doc. 9, pp. 17–18 *with* Doc. 7-13, pp. 12-13; Doc. 9, p. 19 *with* Doc. 7-9, p. 108; Doc. 9, p.

The Commissioner of the Social Security Administration submitted a memorandum in support of her decision. The Commissioner contends that (1) substantial evidence supports her decision and (2) Mr. Hughes's newly submitted evidence does not warrant remand because the evidence is either duplicative, outside the relevant time period, or immaterial to a finding of disability. (Doc. 10, pp. 5-12). Mr. Hughes contends that there is no job he can perform, given his mental and physical limitations. (Doc. 11).

## **ANALYSIS**

To be eligible for disability insurance benefits, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity [because of] a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)). The Social Security Administration applies a five-step sequential analysis to determine if a claimant is disabled.

> This process includes a determination of whether the claimant (1) is unable to engage in substantial gainful activity; (2) has a severe and medically-determinable physical or mental impairment; (3) has such

---

21 *with* Doc. 7-9, p. 108; Doc. 9, p. 22 *with* Doc. 7-8, p. 79; Doc. 9, p. 23 *with* Doc. 7-8, p. 66; Doc. 9, p. 24 *with* Doc. 7-8, p. 85; Doc. 9, pp. 26–27 *with* Doc. 7-8, pp. 81-82; Doc. 9, p. 35 *with* Doc. 7-9, p. 134; Doc. 9, p. 36 *with* Doc. 7-8, p. 62; Doc. 9, p. 37 *with* Doc. 7-12, p. 113; Doc. 9, p. 38 *with* Doc. 7-8, p. 14; Doc. 9, p. 39 *with* Doc. 7-12, p. 24; Doc. 9, pp. 40–43 *with* Doc. 7-12, pp. 102-105.

an impairment that meets or equals a Listing and meets the duration requirements; (4) can perform his past relevant work, in the light of his residual functional capacity; and (5) can make an adjustment to other work, in [] light of his residual functional capacity, age, education, and work experience.

*Gaskin,* 533 Fed. Appx. at 930 (citation omitted). "The claimant's residual functional capacity is an assessment, based upon all relevant evidence, of the claimant's ability to do work despite his impairments." *Id.* (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)); *see also* 20 C.F.R. § 404.1545(a)(1).

In the present case, the ALJ found that Mr. Hughes's degenerative disc disease of the cervical and lumbar spine, depression, and anxiety were severe impairments that cause more than a minimal limitation on his ability to perform basic work activities. (*See* Doc. 7-3, p. 64). Nevertheless, the ALJ concluded that Mr. Hughes is not disabled because he is capable of successfully adjusting to other work that exists in significant numbers in the national economy. (*See* Doc. 7-3, pp. 6-10).

With respect to Mr. Hughes's mental impairments, the ALJ determined that Mr. Hughes's treatment records "fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [Mr. Hughes] were in fact disabled." (Doc. 7-3, p. 71). The ALJ relied on Mr. Hughes's treatment records from Grayson and Associates. (*See* Doc. 7-3, p. 71). The treatment notes from Grayson

and Associates contain the only treating and examining information in the record concerning Mr. Hughes's mental impairments. After reviewing these records, the ALJ stated:

> Treatment notes from Grayson and Associates indicate that the claimant's mental impairments are generally stable on medication. In November 2011, the claimant presented complaining of depression and poor sleep. A mental status examination revealed a depressed mood, flat affect, impaired memory and concentration and paranoid thinking when anxious. The claimant was prescribed Remeron and Klonopin (Ex. 8F at 9). By August 2012, the claimant had a normal mental status examination and complained of no mental health problems (Ex. 8F at 4). In September 2012, he complained that he was down and stressed about money. He had a depressed mood, but no suicidal or homicidal ideation (Ex. 8F at 5). By November 2012, however, his mood was euthymic again. (Ex. 8F at 2). The most recent treatment notes from November 2012 indicate that the claimant had a depressed and anxious mood, but was otherwise stable on medication (Ex. 8F at 3).

(Doc. 7-3, p. 71).

In terms of Mr. Hughes's mental residual functional capacity, the ALJ assigned "great weight" to the opinion of Dr. Robert Estock, a non-examining state agency medical consultant. (*See* Doc. 7-3, p. 72). Dr. Estock opined that Mr. Hughes has only "moderate limitations in activities of daily living, social functioning and concentration, persistence or pace[.]" (*See* Doc. 7-4, pp. 10-11). As part of his review, Dr. Estock referred to the treatment records from Grayson and Associates and indicated that the "notes [are] hard to read." (*See* Doc. 7-4, p. 5). Dr. Estock provided the following observations with respect to Mr. Hughes's mental residual functional capacity:

13

A. Claimant is able to understand and remember simple instructions.

B. Claimant is able to carry out short and simple instructions and attend and concentrate for 2 hour periods on simple tasks with customary breaks and rest during the regular workday. Claimant may benefit from a flexible schedule. Claimant may miss 1-2 days a month of work due to psychological signs and symptoms.

C. Claimant's interaction and contact with the general public should be casual. Criticism and feedback from supervisors and co-workers in the workplace should be casual and non-confronting or supportive.

D. Changes in the workplace should be gradually introduced. Claimant may need assistance in setting realistic goals and making plans.

(Doc. 7-4, p. 11).

Based on a review of the record, the Court does not find substantial evidence to support the ALJ's decision regarding Mr. Hughes's mental residual functional capacity. The Court has carefully reviewed the treatment notes from Grayson and Associates. The notes document Mr. Hughes's visits in May 2010, December 2010, January 2011, March 2011, May 2011 (2), October 2011, November 2011, February 2012, March 2012, June 2012, September 2012, and November 2012 (2). All of the records contain handwritten notes. Dr. Estock noted that the Grayson and Associates records are "hard to read." (Doc. 7-4, p. 5). That is an understatement. The handwritten notes from the November 2011 and September 2012 visits are legible, and the items circled on the typed portion of the mental status exam results of the March 2012 (could be September 2012) and November

2012 records are discernable. The latter amount to a "circle which applies" section that describes Mr. Hughes's appearance, speech, mood, affect, thinking, cognition, suicidal ideation, homicidal ideation, and hallucinations. (*See* Doc. 7-10, pp. 27-30). The balance of the Grayson and Associates records, all containing narrative remarks, are illegible. (*See* Doc.7-10, pp. 27-33; 35-37). The Court does not find any indication in the records that Mr. Hughes is "stable on medication" as the ALJ twice noted. (*See* Doc. 7-3, p. 71) ("claimant's mental impairments are generally stable on medication"; "claimant had a depressed and anxious mood but was otherwise stable on medication[.]"). Neither the ALJ nor Dr. Estock seems to have been able to decipher the narrative portion of the illegible mental health records to determine whether those notes indicate that Mr. Hughes's mental impairments were impacting his daily functioning or his ability to work.

In *Yasmin v. Commissioner of Social Security*, 2009 WL 799457, *13 (M.D. Fla. Mar. 24, 2009), the Court found that the ALJ had not satisfied his duty to fully and fairly develop the record where key portions of the medical records were not legible. The *Yasmin* court, relying on decisions from the Second and Eighth Circuits, held that "the illegibility of important evidentiary material can warrant a remand for clarification and supplementation." *Id*. (citing *Miller v. Heckler*, 756 F.2d 679, 680–81 (8th Cir. 1985); *Brissette v. Heckler*, 730 F.2d 548, 550 (8th Cir. 1984); *Cutler v. Weinbarger*, 516 F.2d 1282, 1285 (2d Cir. 1975); and *Bishop v.*

15

*Sullivan*, 900 F.2d 1259, 1262 (8th Cir. 1990)). The *Yasmin* court found persuasive the Eight Circuit's reasoning in *Bishop*:

> It is the ALJ's duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel. Based on the record before us, we cannot determine whether Bishop's combined impairments following his back surgery meet or equal a listed impairment or whether he is otherwise disabled. We doubt that the ALJ could decipher all the medical reports any better than we could. On remand, the parties should determine which of the medical records are relevant and provide the ALJ with legible copies of these records or direct interrogatories to doctors and hospital personnel. If the ALJ requires additional evidence to make a disability determination, he should order consultative examinations to be performed at the expense of the Social Security Administration. 20 C.F.R. § 404.1517(a)(1989).

*Yasmin*, 2009 WL 799457 at * 13 (quoting *Bishop*, 900 F.2d at 1262).[4] This Court also finds the reasoning of *Bishop* persuasive.

Mr. Hughes's records from Grayson and Associates are important because they provide the only information in the record from a treating source concerning Mr. Hughes's mental impairments. Failure to decipher those records or further develop the administrative record to account for the poor quality of the Grayson and Associates records is not harmless error. Because the records are largely illegible, the Court finds that remand is appropriate so that the Commissioner may take steps to clarify the content of the records or order a consultative evaluation.

---

[4] In *Yasmin*, the Court noted that it could not find an opinion directly on point from the Eleventh Circuit. *Yasmin*, WL 799457, at *13. This Court likewise has not located an Eleventh Circuit opinion addressing the issue of whether illegible medical records on which the ALJ purports to rely warrant remand.

16

Development of this evidence is particularly important because the ALJ stated in his RFC analysis that Mr. Hughes would need to be off task 10% of the day. (Doc. 7-3, p. 67). The ALJ posed a series of hypothetical questions to the vocational expert that incorporated various periods of time that Mr. Hughes would be off task. *See Montana v. Comm'r of Social Security*, WL 4975325, *6 (M.D. Fla. 2016) (quoting *Winchell v. Comm'r of Social Security*, 631 F.3d 1176, 1180 (11th Cir. 2011)) (ALJ may rely on a hypothetical question if the hypothetical "comprises all of the claimant's impairments" which are supported by the medical evidence). The vocational expert, Ms. Russell, testified that if Mr. Hughes needed to be off task for 15% of the day, then no jobs would exist in the national economy that Mr. Hughes could perform. (Doc. 7-3, pp. 111-12). Without identifying an evidentiary basis for the RFC assessment that Mr. Hughes would need to be off task for 10% of the day, and in the absence of legible medical records that would enable the ALJ or this Court to evaluate that potential limitation, the Court cannot determine whether substantial evidence supports the ALJ's residual functional capacity assessment.

# **CONCLUSION**

Consistent with the foregoing, the Court REMANDS this action for further findings and proceedings consistent with this opinion.[5]

**DONE** and **ORDERED** this September 15, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[5] Because the Court remands this action for reconsideration of Mr. Hughes's mental impairments, the Court does not reach the question of whether the new evidence that Mr. Hughes presented to this Court warrants remand.